**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **VERONICA PRICE, ANNA** | ) | |
| **MARIE SCINTO MESIA,** | ) | |
| **DAVID BERGQUIST, ANN** | ) | |
| **SCHEIDLER, PRO-LIFE ACTION** | ) | |
| **LEAGUE**, a non-profit corporation,  and | ) | |
| **THE LIVE PRO-LIFE GROUP**, a ministry | ) | |
| of the Church of Christian Liberty, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| **v.** | ) | **Civil Action No. _____** |
| | ) | |
| **THE CITY OF CHICAGO,** | ) | |
| **RAHM EMMANUEL**, as Mayor of the | ) | |
| City of Chicago, | ) | |
| **REBEKAH SCHEINFELD,** Commissioner | ) | |
| of Transportation for the City of Chicago**,** | ) | |
| and **EDDIE T. JOHNSON,** Superintendent | ) | |
| of the Chicago Police  Department, all in their | ) | |
| official capacities, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, INJUNCTIVE RELIEF,
DECLARATORY JUDGMENT, AND DAMAGES**

Plaintiffs, by and through counsel, complain as follows:

**INTRODUCTION**

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 challenging the

actions of Defendant City of Chicago, Illinois (hereafter, "City") and its agents with respect to

Plaintiffs' expressive activities on the public ways of the City. Plaintiffs seek a declaration that

subsection (j) of the City's Disorderly Conduct ordinance, Chapter 8-4-010(j) (the so-called

"Bubble Zone Ordinance" or "Ordinance"), on its face and as applied, violates the First and

Fourteenth Amendments to the United States Constitution, and an injunction prohibiting the City from enforcing the Ordinance.

2.      Plaintiffs seek a declaration that subsection (j) of the City's Disorderly Conduct ordinance, Chapter 8-4-010(j), is unconstitutional on its face and as applied, as well as preliminary and permanent injunctive relief.

3.      In addition to declaratory and injunctive relief, Plaintiffs seek nominal damages for the past violations of their First Amendment rights.

4.      Plaintiffs are citizens and local organizations who peacefully exercise their First Amendment rights on the public ways near abortion clinics in the City of Chicago by reaching out to women who are approaching the clinics for the purpose of securing abortions in order to share alternatives and inform the women of the dangers inherent in abortion. Plaintiffs wish to continue to engage in their peaceful activities without undue interference from Defendants and the City's Ordinance.

## PLAINTIFFS

5.      Veronica Price is a citizen and resident of the city of Skokie, Illinois. She is a Christian who as a part of her faith regularly traveled to the Family Planning Associates abortion clinic known as the Albany Medical Center ("Albany"), located at 5086 N. Elston, Chicago, Illinois, in order to pray and to reach out to women considering abortion and their partners in order to dissuade them from choosing an abortion. That clinic has since closed due to health code violations. Ms. Price now shares her message at the Family Planning Associates abortion clinic located at 659 West Washington Blvd. in Chicago ("Washington clinic"), among other places.

6.    Anna Marie Scinto Mesia is a citizen and resident of the City of Chicago. She, too, is a Christian who as a part of her faith regularly traveled to Albany in order to pray, speak to women and their partners considering abortion, and to offer literature in order to provide alternatives and to dissuade them from choosing an abortion. Ms. Mesia also reaches out to potentially abortion-bound women at the Flores Brenda-American Women's Medical Center located at 2744 Northwestern Ave. in Chicago, Illinois, among other places.

7.    Ann Scheidler is a citizen and resident of the City of Chicago. She regularly traveled to Albany and continues to frequent other abortion facilities both within and without the City in order to pray, speak to women and their partners considering abortion, and offer literature in order to provide alternatives and to dissuade them from choosing an abortion. Ms. Scheidler also serves as Vice President of the Pro-Life Action League, training and encouraging others to share their faith and good news to hurting women on the public ways of Chicago and all over the country.

8.    David Bergquist is a former security guard and assistant with Plaintiff "Live Pro-Life Group." Mr. Bergquist is a citizen and resident of Harvard, Illinois. He regularly travels to the Washington clinic as well as other locations both within and without the City of Chicago in order to present a witness for life and to pray, speak to women and their partners considering abortion, and offer literature in order to provide alternatives and to dissuade them from choosing an abortion.

9.    The Live Pro-Life Group is a ministry of the Church of Christian Liberty located in Arlington Heights, Illinois that includes both peaceful adults and teenagers. The Live Pro-Life Group regularly ministers to women outside abortion clinics within the City of Chicago and

elsewhere. Mr. Bergquist and the Live Pro-Life Group regularly bring a group of peaceful teenagers who care deeply about the lives of children in the womb and hurting women turning to abortion in the midst of a problem pregnancy to the Washington clinic and elsewhere.

10.     The Pro-Life Action League is a non-profit corporation located in the City of Chicago and dedicated to saving unborn children through nonviolent direct action. Founded in 1980 by Joseph Scheidler, it is one of the oldest and most effective outreaches for life in the country. Its members regularly practice their faith and exercise their First Amendment rights to pray, speak to women and their partners considering abortion, and offer literature in order to provide alternatives and to dissuade them from choosing an abortion within the City of Chicago and elsewhere around the country.

## DEFENDANTS

11.     The City of Chicago is a municipal corporation, duly organized under the laws and constitution of the State of Illinois, to act with governmental powers granted by statute and the state constitution.

12.     Rahm Emanuel is the Mayor of Chicago and is sued in his official capacity.

13.     Rebekah Scheinfeld is the Commissioner of Transportation for the City of Chicago, and is charged with administering the permit scheme of the Public Assembly ordinance. She is sued in her official capacity.

14.     Eddie T. Johnson is the Superintendent of the Chicago Police Department, and is charged with enforcing the Public Assembly and the Bubble Zone ordinances. He is sued in his official capacity.

## JURISDICTION AND VENUE

15.     This action raises federal questions under the First and Fourteenth Amendments of the United States Constitution and under federal law, 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgments), as well as 42 U.S.C. §§ 1983, 1988 and 1920.

16.     This Court has jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343.

17.     This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1343(3), the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, the claim for damages under 42 U.S.C. § 1983, and Plaintiffs' prayer for costs, including reasonable attorney's fees, under 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

18.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391 because the claims arose in this District and Defendants are located in this District.

## FACTUAL ALLEGATIONS

19.     Plaintiffs are individuals and organizations that counsel, pray, display signs, distribute literature, and otherwise peacefully exercise their First Amendment rights on the public sidewalks and rights of way outside abortion clinics and elsewhere on the public ways in the City of Chicago. They offer information and assistance to women approaching abortion clinics in order to urge them to refrain from entering said clinics for abortions, as well as to express their deeply held religious convictions on a matter of great public concern, indeed, a matter of life and death.

20.     Plaintiffs Victoria Price, Anna Marie Scinto Mesia, Ann Scheidler, and David Bergquist are sidewalk counselors. They attempt to engage women approaching the abortion

clinics in a one-on-one conversation in a calm, intimate manner in order to offer information about the dangers involved in abortion and to offer alternatives to abortion and help in pursuing those alternatives.

21.     Plaintiffs' experience has shown that it is necessary to draw as near the women as possible so they can make eye-contact and speak from a normal conversational distance in a friendly and gentle manner. In their experience, counseling women who are considering whether to abort a child is a highly personal matter that requires a showing of genuine care and empathy on the part of the counselor. In addition, the alternatives to abortion that are available differ depending on the individual with whom the counselor is speaking.

22.     Also, ambient noise from cars, trucks, emergency vehicles, busses, motorcycles, trains, construction equipment, whistles, horns, sirens, and even music often make it difficult for Plaintiffs to effectively communicate their oral messages from distances greater than five feet.

23.     Plaintiffs do not wish to shout because they have found shouting to be counter-productive to the peaceful message they wish to express.

24.     Plaintiffs also attempt to hand literature and gift bags to the women. They have found that standing near the path of pedestrians is essential so they can proffer their literature and gift bags near the hands of passersby who can then easily accept them.

25.     In addition to explaining what the literature is, Plaintiffs and their colleagues often find it necessary to draw alongside the women and walk alongside them in order to effectively communicate their message and hand out their literature.

26.     Plaintiffs often encounter opposition from pro-choice advocates who surround, cluster, yell, make noise, mumble, and/or talk loudly to clinic clients for the purpose of

disrupting or drowning out pro-life speech and thwarting Plaintiffs' efforts to distribute literature. When this happens, Plaintiffs cannot be heard or distribute literature unless they are in close proximity to their intended audience.

27. On October 7, 2009, the City of Chicago enacted the Bubble Zone Ordinance, adding a new section to the Disorderly Conduct Ordinance, Code Section 8-4-010. The Bubble Zone Ordinance became codified as section 8-4-010(k). (A later amendment re-labeled this subsection (j).) A copy of the Bubble Zone Ordinance is attached hereto as Exhibit 1. The Ordinance became effective on or about November 16, 2009.

28. The Ordinance creates a large buffer zone around every entrance to a hospital, medical clinic or "healthcare facility" in the City. These buffer zones extend in a fifty (50) foot radius in all directions from every entrance to these facilities, thereby creating vast anti-speech zones on the public ways near numerous healthcare facilities throughout the City. Within the buffer zones, the Ordinance creates a bubble around persons inside the zone, prohibiting anyone from knowingly approaching within eight (8) feet of someone on the public way or sidewalk "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling" without that person's consent.

29. The anti-speech bubbles created by the Ordinance infringe the free speech rights of pro-life counselors and others on the public streets and sidewalks without adequate justification.

30. In fact, the City had no justification for the Ordinance at any location. Although dedicated pro-life advocates like Plaintiffs have maintained a peaceful presence outside a handful

of abortion clinics for decades, there have been no mass blockades, few arrests, no convictions, and no violence, and several abortion clinics have had virtually no pro-life presence at all.

31.     Since the Ordinance became effective, the Chicago police have repeatedly employed the Ordinance to prevent Plaintiffs and others from effectively communicating their message. For example, on or about November 19, 2009, the very first day of the Ordinance's enforcement, at the Albany Clinic located at 5086 N. Elston Ave., Police Officer Erbacci told Plaintiff Ann Scheidler that the Ordinance imposed an *absolute* buffer zone prohibiting any pro-life counselor from coming within 50 feet of a clinic entrance door. He also said that a counselor was prohibited from approaching within eight feet of a person walking toward a clinic entrance door, *no matter where that person was situated,* even when she was outside the 50 foot zone.

32.     Neither statement correctly reflects the requirements of the Ordinance. Officer Erbacci further threatened to cite any person who approached closer than 50 feet from the clinic entrance door. The threat chilled Plaintiffs' activities and infringed their First Amendment rights, as they were forced to remain outside the 50-foot radius of the clinic entrance door for fear of arrest that day.

33.     Just two days later, on or about November 21, 2009, at Planned Parenthood's Near North Center, located at 1200 North LaSalle (the "Near North clinic"), Chicago Police Officer Sergeant Tietz told Plaintiff Pro-Life Action League counselors that the Ordinance prohibited them from approaching *or even standing* within eight feet of anyone approaching the facility entrance door. This edict, which was not supported by the plain language of the Ordinance, severely inhibited Plaintiffs' efforts to reach women entering the clinic with their message of life and hope.

34.     When the pro-life advocates respectfully challenged the officer's interpretation of the Ordinance, he told them that if he had to go get the Ordinance from the station he would come back and arrest them. As a result of the officer's statements and his refusal to consult the actual language of the Ordinance, a pro-life prayer group was forced to move across the street rather than face the threatened arrest. The group was also ordered to remove their pro-life signs to a place beyond 50 feet from the clinic entrance door, even though the Ordinance imposes no such requirement. The signs were moved as ordered.

35.     As a result of the overreaching and conflicting interpretations of the Ordinance by various police officers, in late 2009, Plaintiff Pro-Life Action League, through counsel, asked Chicago's Corporation Counsel under the Illinois Freedom of Information Act ("FOIA") for any and all enforcement guidance on the new ordinance. Chief Assistant Corporation Counsel Mardell Nereim indicated there was no additional guidance provided to law enforcement:

> This is in response to your letter to Mara Georges and Rose Kelly, dated November 20, 2009. In your letter, you ask about the City's policy on the new subsection (k) of the disorderly conduct ordinance. **The ordinance itself is the City's policy**. A copy of the ordinance is attached. We believe the language of the ordinance is clear and are confident that the ordinance is constitutional. (Emphasis added.)

36.     Use of the Bubble Zone Ordinance by Chicago police to infringe the constitutional rights of Plaintiffs and others continued in 2010. On or about January 9, 2010, Chicago Police Officer Hagan told Plaintiffs and other pro-life counselors at the Near North clinic that they were not permitted to come *within 150 feet* of the clinic, an apparent reference to another portion of the Disorderly Conduct statute (no longer in effect) which prohibits *picketing* within 150 feet of a *school*. Officer Hagan then changed her instruction to state: "You guys

cannot come within eight feet of this doorway. If you come within 50 feet of the doorway, and within eight feet of the doorway, and start giving them things, chanting prayers, when someone is coming down, you will be written an NOV. *You cannot do any abortion* [inaudible], *counseling*, or anything like that. . . . It's a law in the City of Chicago. They made it and I'm here to enforce it." (Emphasis added.)

37.     Officer Hagan also stated that under the Ordinance, Plaintiffs and other pro-life counselors could only offer literature to an approaching person *if that person asked for it*. Plaintiffs and other pro-life counselors were prohibited by the police officer even from *speaking* to the persons going into the clinic, regardless of whether the counselors were stationary. Needless to say, this draconian restriction seriously impaired Plaintiffs' ability to share their life-giving message with the women entering the clinic, and is not consistent with the language of the Ordinance.

38.     The confusion and inconsistency of interpretation of the Ordinance has been so bad that the police officers not infrequently contradict themselves about its meaning and application. Also on January 10, 2010, at the same location, when pro-life advocate David Avignone was told by a Chicago Police Department patrol officer that he could not stand within eight (8) feet of the entrance, he politely refused, stating that his constitutional rights entitled him to stand there. The police officer called for backup, and two sergeants responded, Sgt. Mendez and Sgt. Richards.

39.     The sergeants heard the complaint, reviewed the Ordinance, and then concluded that Mr. Avignone was in fact entitled to remain within eight feet of the clinic entrance, thereby

tacitly affirming that the Ordinance does not address where a stationary pro-life advocate may stand, so long as he is not blocking the entrance.

40.     Nevertheless, one month later, on or about February 13, 2010, outside that same Near North clinic, Chicago Police Officer Hagan offered a different interpretation of the Ordinance from the one she had provided only a month before and different from the one the two sergeants had rendered. On this occasion, she told pro-life counselors that they were prohibited from approaching closer than *ten* feet to the clinic entrance door, even though that distance is nowhere mentioned in the text of the Ordinance.

41.     As a result of Officer Hagan's order, Plaintiffs and their colleagues had to move back on the public sidewalk to stand approximately ten feet from the doorway, further infringing their First Amendment rights and hindering their ability to communicate with their intended audience.

### Wrongful Arrests under the Ordinance

42.     The Ordinance has also been wrongfully used to arrest peaceful and law-abiding pro-life individuals exercising their First Amendment rights on the public ways near abortion clinics. On or about July 3, 2010, outside the Near North clinic, at approximately 11:00 a.m. pro-life counselor Joseph Holland assumed a position against the wall a few feet away from the entrance door to the clinic, where a pro-abortion "escort" had been standing but left. Mr. Holland stood still and began praying.

43.     Moments later, the "escort" returned and ordered Mr. Holland to move eight feet away. Mr. Holland did not respond, and the woman grew louder and more insistent. When Mr.

Holland still refused to move, the escort began pressing her body into his and stepping on his toes.

44.     Mr. Holland stood his ground. The escort then called for assistance from other escorts, who in turn called the police. Mr. Holland prayed the Rosary out loud, while the escort mocked him as they waited for the police.

45.     When the police arrived, Chicago Police Officer Randy Stevens went immediately to the escorts and spoke to them. He then approached Mr. Holland, but only to ask for his identification. Mr. Holland asked why, and Officer Stevens told him that if he did not comply he would be arrested. Mr. Holland called for a fellow pro-life counselor, David Avignone, to come and help explain their understanding of the Ordinance to the Officer.

46.     Officer Stevens disagreed with their interpretation, and again ordered Mr. Holland to produce his identification, which Mr. Holland did. Then Officer Stevens went back to speak with the Planned Parenthood escorts again.

47.     Officer Stevens then returned to Mr. Holland and told him he  was being arrested "for standing within 8 feet of the clinic entrance door." Mr. Holland was handcuffed and taken away in a squad car. Other pro-life advocates tried to explain the Bubble Zone Ordinance to Officer Stevens even as he was arresting Mr. Holland, but Officer Stevens insisted that he was not interpreting the Ordinance and that the judge would be the one to do that.

48.     Officer Stevens said that Mr. Holland was clearly causing a "disturbance" anyway, and that praying the Rosary could be considered a form of harassment because he thought it was intended to annoy and harass the escorts.

49.     Officer Stevens wrongfully interpreted the Ordinance as prohibiting "any kind of verbal expression" within the 50 foot buffer zone. He further stated that *he considered the Ordinance vague*, but nevertheless believed that Mr. Holland had violated the law.

50.     On or about August 6, 2010, the City dropped the charges against Mr. Holland.

51.     On or about July 8, 2010, just days after Officer Stevens arrested Mr. Holland, he told pro-life counselor David Avignone that *even extending his arm to offer a client literature constituted an illegal "approach"* under the Ordinance – a gesture which he had been previously told by other officers was permissible – and therefore arrested him. This interpretation is unsupported by the language of the Ordinance and unlawfully infringes the First Amendment rights of Plaintiffs and others not before the Court.

52.     The charges against Mr. Avignone were also subsequently dropped.

**Further Abuses of Plaintiffs' Rights under the Ordinance**

53.     On several occasions, Defendant City's police officers have ordered Plaintiffs and other pro-life advocates to stay outside of the 50 foot buffer zone around the clinic entrances. For example, on October 6, 2012, at the Albany Clinic on North Elston in Chicago, Sgt. Whitney of the Chicago Police Department ordered Plaintiffs and others not to approach the clinic entrances closer than 50 feet on threat of arrest.

54.     Again, on February 26, 2013, also at the Albany Clinic, Chicago Police Officer Haran threatened pro-lifer Andrew Spiropoulos with arrest unless he moved over 50 feet away from the clinic entrance door. As a result, Mr. Spiropoulos and several other pro-life counselors were forced to move so far away that they could not communicate with persons approaching the clinic.

55.     On or about March 9, 2013, Chicago Police Officer Whitney told pro-life counselor Catherine Mieding that pro-lifers must stand at least 50 feet away from the clinic entrance. When he was told that Sergeant Nemis had said just the opposite only a few days before, he said, "Well, I'm in charge today."

56.     On June 6, 2015, a Chicago police officer told Eric Scheidler of Plaintiff Pro-Life Action League at the Albany clinic on Chicago's northwest side that Plaintiffs and other pro-life advocates were not allowed within 50 feet of the clinic entrances, including the entrance to the parking lot.

57.     Again, on August 27, 2015, at the Albany clinic, several Chicago police officers responded to the clinic when someone from the clinic called. After reviewing and discussing the Ordinance for some time, they first ordered that Plaintiffs must stay away 50 feet from the gate to the parking lot, but then reduced it to eight (8) feet, apparently treating it as an entrance to the clinic deserving of a buffer, based upon the bubble that the Ordinance grants to persons.

58.     On November 21, 2015, at the Washington clinic, pro-life counselor Rob Taylor was speaking with women and their companions as they entered the clinic when a Chicago police officer ordered him not to come within 10 feet of the clinic entrance, treating the *eight* foot *bubble* as if it were a *ten* foot *buffer* zone, to the detriment of Plaintiffs and others not before the Court.

59.     That same day, November 21, 2015, an ambulance was called to the Washington clinic and a woman, presumably an abortion patient, was wheeled out on a stretcher and taken away. Thus not only are the lives of the innocent children in the womb at stake, but the lives and well-being of the women upon whom abortions are performed are at risk as well.

60.     As recently as April 2, 2016, at the Near North clinic, Sergeant Murphy ordered the Live Pro-Life counselors to move *100 feet away* from the door. Another squad car arrived, and Sergeant Murphy conferred with the other officer. As the pro-life counselors moved far away from the entrance, Sergeant Murphy told Mr. Bergquist that he "stood corrected" that they need only move 50 feet away from any entrance to the clinic, and for anyone entering the clinic, the pro-life advocates had to "give them an eight-foot buffer zone."

61.     Sergeant Murphy also instructed the pro-life advocates that they "can't give them leaflets" and that if they did they would be "violating the law, the ordinance in Chicago, which is disorderly conduct." He further instructed that the pro-life advocates could not hand the women anything and could not "counsel them."

62.     When Mr. Bergquist explained that his understanding of the Bubble Zone ordinance was that it allowed him to be within the 50 foot buffer zone and that he had to remain eight feet away from women entering the clinic if they did not consent, Sergeant Murphy responded that "it's up to the interpretation of the person . . . being harassed by you."

63.     Sergeant Murphy then reiterated that in his interpretation of the Ordinance, "you cannot be within fifty (50) feet of the door." He also added that even *outside* the 50 foot buffer zone pro-life advocates had to stay eight feet away from anyone they were speaking with.

64.     When Mr. Bergquist attempted to clarify how they could hand gift bags to women entering the clinic a few minutes later, Sergeant Murphy responded, "Ah, I would say you don't."

65.     Mr. Bergquist then asked whether he could engage with the women entering the clinic verbally; Sergeant Murphy flatly told him no, "you can't counsel them. That's in the

ordinance." Mr. Bergquist told Sergeant Murphy that he and others had been going to the clinics for a few years, and that they had never been told what Murphy was telling them. Sergeant Murphy told Bergquist that he was only saying "what I was explained (sic) from my higher ups who are very . . . pretty experienced" with protests.

66.     Under the severe restraints imposed by Sergeant Murphy, Plaintiffs were no longer able to hand out gift bags or to speak with any women entering the clinic.

### The Ordinance is Selectively Applied

67.     While Defendants zealously apply the Ordinance against pro-life advocates, they do not apply it at all against pro-choice advocates such as the clinic escorts, despite the escorts' violating the plain dictates of the Ordinance.

68.     The Ordinance purports to prohibit *anyone* from approaching "another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way within a radius of 50 feet from any entrance door" of an abortion facility or healthcare facility. *See* Ex. 1, copy of Ordinance.

69.     Yet within the 50 foot buffer zone, escorts routinely approach within eight feet of others without obtaining consent, including both patients and pro-life advocates, for the purpose of engaging in oral protest, education and/or counseling, and the police have never applied the Ordinance against such escorts and pro-choice advocates.

70.     This discriminatory application of the Ordinance has been repeatedly affirmed both in word and deed. For example, on September 27, 2014, Chicago Police Officer Grantz responded to a call from the clinic escorts at the Washington clinic. Plaintiffs and the pro-life

advocates were ordered to remain 50 feet away from the clinic entrance while clinic escorts were allowed free rein within the buffer zone.

71.     When pro-life advocates asked Officer Grantz whether there was a prohibition against escorts taking away from clients pro-life literature that had been given them, Officer Grantz responded that he could do nothing unless the clients complained to him themselves.

72.     One week later, on October 4, 2014, Officer Grantz was again called by the clinic escorts to that same Family Planning Associates clinic. On this occasion, Plaintiff David Bergquist and others were on the public sidewalk outside the clinic when escorts complained the pro-life counselors were violating the Ordinance by stationing themselves within eight (8) feet of the clinic entrance.

73.     Officer Grantz proceeded to order *Plaintiffs* and others to remain ten to fifteen feet (10-15') from the entrance. He did *not* order *the escorts* to remain away from the entrance, however.

74.     The pro-life advocates asked him directly whether the Bubble Zone Ordinance applies to the clinic escorts. Officer Grantz stated that *it does not*, because they are invited by the clinic and have "authorized entry into the building." The language of the Ordinance provides no exception for those with "authorized entry into the building."

75.     When Plaintiff Bergquist and others complained that being forced to remain at such a distance interferes with their attempts to have close and intimate conversations with the women seeking entrance and makes it seem as if they are yelling at them, Officer Grantz brushed them off.

76.     Chicago Police Officer Schipplick also wrongfully enforced the Ordinance against Plaintiffs and other pro-life witnesses at that same location on October 4, 2014. He specifically asked Mr. Bergquist if he "knew the rules." When Mr. Bergquist responded in the affirmative, Officer Schipplick warned him, "If I come back here, someone's going to jail, do you understand?"

77.     Officer Schipplick then ordered the pro-lifers eight (8) feet back from the door. Mr. Bergquist asked, "OK, is that for the 'Bubble Law?" To which Officer Schipplick responded, "Yeah."

78.     Mr. Bergquist went back to the officer a few minutes later and asked him whether the clinic escorts had to be eight feet back also. Officer Schipplick responded: "No." Mr. Bergquist said, "Just us." Officer Schipplick nodded yes.

79.     One week later, on Saturday, October 11, 2014, at the Albany clinic located at North Elston Street, Sgt. Olszewski of the Chicago Police Department ordered pro-life advocates to remain 50 feet away from the entrance to the *parking lot*, which placed them much farther back than 50 feet from the *clinic* entrance, thereby hindering their ability to reach and effectively communicate their message to clinic clients even further.

80.     While Plaintiffs and their pro-life colleagues scrupulously seek to obey the law, clinic escorts routinely and intentionally interfere with Plaintiffs' constitutionally protected expressive activities.

81.     For example, on December 7, 2013, at the Washington clinic, clinic escorts led by Benita Ulisano lined up in front of a large pro-life sign and the pro-life advocates holding it in order to block the sign from view of the women entering the clinic. In addition, they recited from

the "vagina monologues" in an apparent effort to silence the pro-life message and to "educate" or "counsel" (i.e. offend) the pro-life advocates.

82.     Again, on July 17, 2014, a young male clinic escort came all the way across the street at the Washington clinic in order to get right in front of the camera of a pro-life witness so as to interfere with his ability to record what was happening outside the clinic. As he was leaving, he made an obscene gesture at another pro-life witness.

83.     At that same location, on October 4, 2014, two clinic escorts intentionally stood in front of Plaintiff David Bergquist and a second pro-life witness, blocking their movement on the public sidewalk outside the clinic.

84.     Also on that same date, October 4, 2014, a clinic escort at the Albany abortion clinic on North Elston intentionally stood right in front of a pro-life advocate in order to block his sign from the view of a patient. Although this incident occurred in the presence of a Chicago police officer, no action was taken against the escort.

85.     On October 29, 2014, Plaintiff David Bergquist and others went to four different abortion clinics in the City. The Family Planning Associates on Washington Blvd. was the last clinic they visited that day. When Mr. Bergquist positioned himself near – but not in front of – the clinic entrance, the clinic escorts called the police.

86.     Before the police arrived, Mr. Bergquist held a sign expressing his pro-life views. Eventually John Jansen, an employee of Plaintiff Pro-Life Action League, took Mr. Bergquist's place next to the door, and he held the sign. Mr. Bergquist then moved and stood next to some of the escorts on the other side of the door, about four feet from the entrance.

87.     Three Chicago police officers arrived, two in an SUV (Sergeant Easterday and Sergeant Engstrom) and one on a bicycle. The two sergeants were rude and insisted that the pro-life counselors should move back because they were obstructing the entrance; they were not.

88.     Sergeant Engstrom then went to Mr. Jansen, where clinic escort Benita Ulisano was demanding that Mr. Jansen move back eight feet from the door, and immediately took up Ms. Ulisano's side. Sergeant Engstrom cussed at Mr. Jansen and ordered him to move away from the door "at least a good eight feet away." Sergeant Engstrom then warned: "And I will, seriously, if you come back within these boundaries, I will have you locked up."

89.     The intent of the escorts to interfere with the pro-lifers' attempts to communicate their message and assist women entering the clinic need not be left to guesswork; they have openly declared it on public Facebook messages. As long-time clinic escort Dennis Murphy posted to fellow escorts on or about August 3, 2013: "Don't forget **to overly intimidate, my friend.**" (Emphasis added.) And in fact Mr. Murphy has engaged in tactics intended to intimidate.

90.     The use and abuse of the Ordinance against Plaintiffs and others has continued to the present, and Defendants' refusal to apply the Ordinance or other laws against the clinic escorts has encouraged them to grow even more aggressive.

91.     On April 4, 2015, clinic escorts at the Washington clinic increased their aggressive attempts to impede Plaintiffs' efforts to communicate with women seeking to enter the clinic and to hand them literature and gift bags.

92.     On previous occasions, while the escorts would complain if pro-life counselors stood right next to the door to the clinic, they never objected to the counselors standing near the fire hydrant, which is 10-12 feet from the entrance.

93.     This time, however, the escorts demanded that pro-life counselors not even remain near the fire hydrant. The police were called.

94.     When they arrived, the officers remained in their vehicles for several minutes, apparently conferring with someone on their cell phones and observing as Plaintiffs and others continued to peacefully offer literature and gift bags to willing recipients entering the clinic. Eventually Officer Steve Woods emerged and ordered Plaintiffs to remain "seven or eight feet away from the door," although he permitted them to continue to extend their arms to offer literature and gift bags to the women entering the clinic. Plaintiff Bergquist asked him whether that was "the Bubble law" that he was relying on, and he confirmed, "that's the Bubble."

95.     Minutes later, the escorts again seized upon Defendants' wrongful interpretation of the law to intentionally interfere with Plaintiffs' attempts to communicate with the women entering the clinic. While Plaintiffs and their colleagues were prohibited even from stationing themselves within eight feet of the clinic entrance, pursuant to the Order from that day, the escorts moved freely within the prohibited zone and purposely stood within that space right in front of the pro-life advocates so as to block them from offering a gift bag to the women entering the clinic. They even went so far as to lean over when the pro-lifer tried to extend her arm around the escort so that the stationary pro-lifer could not reach the intended recipient.

96.     On May 21, 2015, Plaintiff Ann Scheidler and others were present at the Albany Medical Center on North Elston Avenue. When Ms. Scheidler engaged a woman parking her car

on Elston in conversation and began urging her not to enter the clinic and giving her some literature, an escort raced over and interrupted to tell the woman to go into the parking lot. The escort also shoved Ms. Scheidler and yelled at her to get away.

97.　　Ms. Scheidler then informed the escort that she was on public property and told her not to touch her. Despite the fact that Ms. Scheidler was the victim, when she reported the incident. Officer Scalera of the Chicago Police Department immediately took the side of the escort, telling Ms. Scheidler that she had no right "to bother people."

98.　　When Ms. Scheidler protested that the escort had shoved her, Officer Scalera ignored her. He refused even to take a report of the matter, and instead instructed Ms. Scheidler that she could not block the entrance, which she had not done and has never done. He also ordered her that she had to keep walking and that she could not "bother people." Not once did he instruct the escorts or caution them in any manner.

99.　　Similarly, on June 6, 2015, at the Washington clinic, pro-life advocate Carolyn Righeimer was shoved out of the way by a clinic escort known as "Nina." The police were called, but even though "Nina" admitted to "bumping" Carolyn, Officer Little declined even to document the incident.

100.　　The escorts' aggressive interference with Plaintiffs' efforts to share their message has continued to the present. For instance, on March 5, 2016, escorts purposely positioned themselves right in front signs that Plaintiffs and their colleagues were peacefully displaying in order to prevent women and others entering the Washington clinic.

101.　　On April 2, 2016, at the Near North clinic, escorts attempted to order one of the Live Pro-Life student counselors, who was standing stationary a few feet to the side of the

entrance, to move fifteen (15) feet away from the door. When Plaintiff Bergquist instructed the student to stay where she was, a clinic escort proceeded to physically assault the teenager by bumping her with her body, apparently trying to intimidate her or force her away from her chosen location.

102.    The police were called, and Sergeant Murphy responded. When he did not require the Live Pro-Life counselor to move away from her position near the door, the clinic escorts took additional action. As a woman approached the entrance, the Live Pro-Life counselor reached out to hand her a gift bag, but the clinic escort blocked the counselor. The woman stopped, hesitated, as if she were going to come back for the bag, but the escort took her by the arm and pulled her into the clinic.

103.    And as recently as Saturday, August 20, 2016, Warren Dorman and others were present at the Washington Blvd. when an escort snatched from a woman entering the clinic literature the pro-life advocates had offered and the woman had willingly taken.

104.    Again, on August 13, 2016, at the same location the escorts grew loud and irate when Mr. Dorman and others chose to stand within eight (8) feet of the entrance, although still well back and out of the way of anyone entering or exiting. Under the biased and unequal application of the Ordinance, escorts act as if they own the public sidewalks.

105.    In addition, escorts continue to sing, dance, and raise their hands in order to disrupt and interfere with the efforts of the pro-life advocates to communicate their message with women entering the clinic and to hand them informative literature.

106.    The Ordinance, on its face and as applied, inflicts irreparable injury on the First and Fourteenth Amendment rights of Plaintiffs and others.

107.     Unless and until this Court issues injunctive relief, Defendants will continue to enforce the Ordinance through its officers, servants, agents, and employees, further infringing Plaintiffs' constitutional rights.

108.     All of the acts of the City, its officers, servants, agents, and employees, as alleged herein, were done and are continuing to be done under color and pretense of the statutes, ordinances, regulations, policies, customs, and usages of the City of Chicago and the State of Illinois.

## FIRST CAUSE OF ACTION
### Violation of the rights of Freedom of Speech and of the Press
### Under the First Amendment to the U.S. Constitution

109. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-105 above.

110. The public ways and sidewalks affected by the Bubble Zone Ordinance's provisions are traditional public fora.

111. Plaintiffs' pro-life political and religious speech lies at the core of the First Amendment.

112. The Bubble Zone Ordinance is overbroad on its face and as applied because it prohibits speech and expressive activities of Plaintiffs and third parties not before the Court in the restricted areas, which are traditional public fora.

113. The Bubble Zone Ordinance is overbroad on its face and as applied because it prohibits speech in areas outside of *all* "healthcare facility[ies]," even those that have had no expressive activities or difficulties of any kind in the past or that are unrelated to abortion.

114. The Bubble Zone Ordinance is overbroad on its face and as applied because it creates hundreds of speech-restrictive bubbles all over the City of Chicago in areas and under circumstances in which the City has no alleged interest in restricting speech, and it repeatedly creates new bubbles whenever a physician's office or health care facility opens or relocates.

115. The Bubble Zone Ordinance is overbroad on its face and as applied because within the buffer zones it prohibits individuals from approaching others without their consent whether an individual intends to enter a healthcare facility.

116.     The Bubble Zone Ordinance is overbroad on its face and as applied because its speech restrictions apply in a "healthcare facility['s]" buffer zone even when the facility is closed.

117.     The Bubble Zone Ordinance is overbroad on its face and as applied because within its bubbles it prohibits most First Amendment protected leafleting, which is directed towards recipients who have neither given nor refused consent yet and are less than eight feet away from the leafleter.

118.     Because the Bubble Zone Ordinance is an unconstitutionally overbroad restriction on expressive activity, the Ordinance restricts more speech than necessary to achieve any governmental interest.

119.     The Bubble Zone Ordinance is an unconstitutional content-based restriction on speech because it targets certain categories of speech; that is, passing a leaflet or handbill, displaying a sign, or engaging in oral protest, education, or counseling.

120.     The Bubble Zone Ordinance is an unconstitutional content- and viewpoint-based restriction, because it was enacted and is applied so as to restrict pro-life speech, but to permit unrestricted speech in favor of abortion or concerning topics and speakers not disfavored by the City.

121.     The Bubble Zone Ordinance is an unconstitutional content- and viewpoint-based restriction because it has been interpreted and applied to restrict only pro-life speech, but to permit unrestricted speech in favor of abortion or concerning topics and speakers not disfavored by the City.

122.     The Bubble Zone Ordinance discriminates on its face and as applied against Plaintiffs and others by prohibiting them from engaging in speech and other expressive activities in traditional public fora based solely upon the pro-life content and viewpoint of their speech.

123.     The Bubble Zone Ordinance is an unconstitutional content- and viewpoint-based restriction on expression because it requires a government official, pursuant to unbridled discretion, to determine what speech and speakers within the City are restricted by the Ordinance, what constitutes an unlawful "approach," what is a "hospital, medical clinic or healthcare facility," and what is an "entrance door."

124.     The Bubble Zone Ordinance is an unconstitutional content-based restriction on expression because it unlawfully discriminates based on the content of the message conveyed. Public expression concerning labor relations free of government regulation under the Illinois Labor Dispute Act, 820 ILCS 5/1 – 1.5, and therefore speech related to labor relations is exempted under the Bubble Zone Ordinance, while speech related to abortion is severely restricted.

125.     The Bubble Zone Ordinance imposes an impermissible prior restraint on constitutionally protected speech because it restricts speech in advance of expression on the public ways and sidewalk areas outside health care facilities and other businesses and establishments, but provides no criteria to guide decision-makers in determining what speech is permissible.

126.     The Bubble Zone Ordinance's ban on free speech activities in the public ways and sidewalk areas outside healthcare facilities imposes an unconstitutional restriction on constitutionally protected speech in traditional public fora.

127.     No compelling, substantial, or even legitimate governmental interest exists to justify the Bubble Zone Ordinance's restrictions on speech in traditional public fora.

128.     The Bubble Zone Ordinance is not the least restrictive means to accomplish any permissible purpose sought to be served by the City, and the Ordinance restricts substantially more speech than necessary.

129.     The Bubble Zone Ordinance is not narrowly tailored to serve any asserted interest of the City.

130.     The Bubble Zone Ordinance both on its face and as applied violates Plaintiffs' rights to freedom of speech and of the press under the First Amendment to the United States Constitution.

131.     Plaintiffs' effective communication of their message requires a personal approach to persons on the public ways, and the Ordinance completely forecloses this method of communication.

132.     Plaintiffs have no adequate remedy at law for the violation of their federal constitutional rights.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the prayer for relief.

## SECOND CAUSE OF ACTION
### Violation of Due Process under the Fourteenth Amendment
### to the U.S. Constitution

133.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-105 above.

134.     The Bubble Zone Ordinance is an unconstitutionally vague restriction on speech on its face and as applied because it fails to adequately advise, notify, or inform persons subject to prosecution under its terms of its requirements, including the requirement as to what activities constitute an "approach" to persons and when such other person "consents."

135.     The Bubble Zone Ordinance is an unconstitutionally vague restriction on speech on its face and as applied because it fails to provide fair notice and warning to individuals as to when and under what circumstances the consent requirement applies and is satisfied.

136.     The Ordinance is unconstitutionally vague because it lacks any standards or criteria to guide those charged with enforcing it and thus gives government officials unbridled discretion to determine which speech activities are, and which are not, permissible within the bubbles it creates.

137.     The Ordinance is an irrational and unreasonable policy, which imposes irrational and unreasonable restrictions on the exercise of Plaintiffs' constitutional rights.

138.     The City does not have a compelling, or even rational, reason to prevent Plaintiffs from engaging in their constitutionally protected speech and expressive activities.

139.     The Ordinance violates Plaintiffs' due process rights on its face and as applied in violation of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the prayer for relief.

**THIRD CAUSE OF ACTION**
**Violation of the Equal Protection Clause**
**of the Fourteenth Amendment to the U.S. Constitution**

140.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-105 above.

141.     The Equal Protection Clause of the Fourteenth Amendment requires that the government treat similarly situated persons equally.

142.     Defendants selectively enforce the Bubble Zone Ordinance against Plaintiffs and other pro-life advocates but do not enforce it against pro-choice advocates such as clinic escorts.

143.     In enacting and enforcing the Bubble Zone Ordinance, the City has treated and has authorized itself to treat Plaintiffs differently than similarly situated persons based on the content and viewpoint of their speech, thereby suppressing the exercise of Plaintiffs' constitutional rights.

144.     The Bubble Zone Ordinance and the City's interpretation and enforcement of it against Plaintiffs violate various fundamental rights of Plaintiffs, such as their rights of free speech, freedom of the press, free assembly, and free exercise of religion.

145.     When government regulations like the Bubble Zone Ordinance infringe on fundamental rights, discriminatory intent is presumed.

146.     The City has no compelling, or even rational, interest in prohibiting Plaintiffs' speech and expressive activities, while permitting similarly situated individuals to engage in speech on other topics and from different viewpoints on the public ways and sidewalks restricted by Ordinance.

147. The Ordinance is not the least restrictive means and is not narrowly tailored to accomplish any permissible purpose sought to be served by the City.

148. The Ordinance violates Plaintiffs' rights to equal protection on its face and as applied, in violation of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the prayer for relief.

## FOURTH CAUSE OF ACTION
### Violation of the Illinois Constitution, Art. I, Sections 4 and 5

149. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-105 above.

150. Article I, Section 4 of the Illinois Constitution states: "All persons may speak, write and publish freely, being responsible for the abuse of that liberty." Section 5 states: "The people have the right to assemble in a peaceable manner, to consult for the common good, to make known their opinions to their representatives and to apply for redress of grievances."

151. Plaintiffs' freedom of speech, freedom of the press, and freedom of assembly have been restrained by the Bubble Zone Ordinance and by the City's invidious and unduly burdensome enforcement of it against Plaintiffs, as set forth above.

152. Plaintiffs have suffered and are suffering irreparable injury to their constitutional rights.

153. Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that judgment be entered in their favor and that relief be granted against Defendants as follows:

A.     That this Court assume jurisdiction over this action;

B.     That the Court declare the Bubble Zone Ordinance unconstitutional on its face because it violates the rights of Plaintiffs and others not before the court to the freedoms of speech, of the press, and of the free exercise of religion, as well as the rights to due process and equal protection, which are guaranteed to Plaintiffs and others under the United States Constitution;

C.     That the Court declare the Bubble Zone Ordinance unconstitutional as applied to the speech and expressive activities of Plaintiffs as described herein, because they violate Plaintiffs' right to freedom of speech, of the press, and of the free exercise of religion, as well as the rights to due process and equal protection, which are guaranteed to Plaintiffs and others under the United States Constitution;

D.     Enter preliminary and permanent injunctive relief against the Ordinance, on its face with respect to Plaintiffs and others not before the Court, and as applied to Plaintiffs;

E.     Award Plaintiffs nominal damages;

F.     Award Plaintiffs their costs of litigation, including reasonable attorneys' fees and costs; and

G.     Grant such other and further relief as this Court deems just and proper.

Plaintiffs demand a jury for all issues so triable.

FOR THE PLAINTIFFS,

**Thomas More Society**

By: /s/ Thomas Brejcha
Thomas Brejcha
President and Chief Counsel
Peter C. Breen, Special Counsel
Thomas Olp, Associate Counsel
19 S. LaSalle, Ste 603
Chicago, IL 60603
Direct: (312) 782-1680
Fax: (312) 782-1887
Email: tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
tolp@thomasmoresociety.org

and

Stephen M. Crampton*
P.O. Box 4506
Tupelo, MS 38803
Direct: (662) 255-9439
Fax: (662) 840-5846
Email: smcrampton@hotmail.com

and

Michael J. DePrimo*
778 Choate Ave.
Hamden, CT 06518
Direct: (203) 893-9393
michaeldeprimo@gmail.com

*Pending admission pro hac vice

*Attorneys for Plaintiffs*

**EXHIBIT ONE TO COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES:**

CHICAGO CODE
DISORDERLY CONDUCT (§ 8-4-010)

**A person commits disorderly conduct when he knowingly:**

a. Does any act in such unreasonable manner as to provoke, make or aid in making a breach of peace; or

b. Does or makes any unreasonable or offensive act, utterance, gesture or display which, under the circumstances, creates a clear and present danger of a breach of peace or imminent threat of violence; or

c. Refuses or fails to cease and desist any peaceful conduct or activity likely to produce a breach of peace where there is an imminent threat of violence, and where the police have made all reasonable efforts to protect the otherwise peaceful conduct and activity, and have requested that said conduct and activity be stopped and explained the request if there be time; or

d. Fails to obey a lawful order of dispersal by a peace officer who has identified himself as such, or is otherwise reasonably identifiable as such, issued under circumstances where three or more persons are committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm; or

e. Fails to obey an order by a peace officer, traffic control aide, fire department official, or other official, who has identified himself as such, or is otherwise reasonably identifiable as such, issued under circumstances where it is reasonable to believe that the order is necessary to allow public safety officials to address a situation that threatens the public health, safety, or welfare; or

f. Assembles with three or more persons for the purpose of using force or violence to disturb the public peace; or

g. Remains in the public way in a manner that blocks customer access to a commercial establishment, after being asked to clear the entrance by the person in charge of such establishment; or

h. Appears in any public place manifestly under the influence of alcohol, narcotics or other drug, not therapeutically administered, to the degree that he may endanger himself or other persons or property, or annoy persons in his vicinity; or

i. Reserved.

**j. Either: (1) knowingly approaches another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way within a radius of 50 feet from any entrance door to a hospital, medical clinic or healthcare facility,** or (2) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person entering or  leaving any hospital, medical clinic or healthcare facility.

**A person convicted of disorderly conduct shall be fined not more than $500.00 for each offense.**

(Prior code § 193-1; Amend Coun. J. 3-27-02, p. 82299, § 1; Amend Coun. J. 12-4-02, p. 99931, § 5.1; Amend Coun. J. 4-9-03, p. 106396, § 1; Amend Coun. J. 7-26-06, p. 81863, § 1; Amend Coun. J. 10-17-09, p. 72710, § 1; Amend Coun. J. 12-12-12, p. 44056, § 1; Amend Coun. J. 9-11-13, p. 59869, § 3