**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VERONICA PRICE, et al. | ) | |
| | ) | |
| | ) | No. 16-cv-8268 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Hon. Amy J. St. Eve |
| | ) | |
| THE CITY OF CHICAGO, et. al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Defendants the City of Chicago (the "City"), Rahm Emmanuel in his official capacity as the Mayor of the City of Chicago, Rebekah Scheinfeld in her official capacity as Commissioner of Transportation for the City of Chicago, and Eddie T. Johnson in his official capacity as the Superintendent of the Chicago Police Department (collectively, "Defendants") move to dismiss Plaintiffs Veronica Price, David Bergquist, Ana Scheidler, Anna Marie Scinto Mesia, the Pro-Life Action League, and The Live Pro-Life Group's (collectively, "Plaintiffs") complaint under Federal Rule of Civil Procedure 12(b)(6). (R. 16.) For the following reasons, the Court grants in part and denies in part Defendants' motion.

# BACKGROUND[1]

## I.     Factual Allegations

This case centers on the City of Chicago's Disorderly Conduct Ordinance (the "Ordinance"), which was enacted in October 2009 and provides that a person commits disorderly conduct when he:

> knowingly approaches another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way within a radius of 50 feet from any entrance door to a hospital, medical clinic or healthcare facility.

Municipal Code of Chicago ("MCC") § 8–4–010(j)(1); 2 Journal of the Proceedings of the City Council of the City of Chicago, Illinois, Oct. 7, 2009, 72711–12.  The Ordinance is modeled on and nearly identical to a Colorado law upheld as constitutional in *Hill v. Colorado*, 530 U.S. 703 (2000).  The only material difference between the two laws is the size of the area within which the eight-foot "bubble zone" applies: the Ordinance's restrictions apply inside of a 50-foot radius, while the Colorado statute's restrictions applied within a 100-foot radius.  *Compare* MCC § 8-4-010(j)(1), *with Hill*, 530 U.S. at 707 n.1 (quoting Colo. Rev. Stat. § 18-9-122(3)).

Plaintiffs are citizens and organizations "who peacefully exercise their First Amendment rights on the public ways near abortion clinics in the City of Chicago by reaching out to women who are approaching the clinics for the purpose of securing abortion in order to share alternatives and inform the women of the dangers inherent in abortion."  (R. 1, Compl., at ¶ 4.)  They "counsel, pray, display signs, [and] distribute literature . . . on the public sidewalks and rights of

---

[1] The facts presented in the Background are taken from the complaint and are presumed true for the purpose of resolving the pending motion to dismiss.  *See Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir. 2014); *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

way outside abortion clinics and elsewhere on the public ways in the City of Chicago." (*Id.* at ¶ 19.) Particularly relevant to this case is the practice of "sidewalk counsel[ing]," in which Plaintiffs "attempt to engage women approaching the abortion clinics in a one-on-one conversation in a calm, intimate manner in order to offer information about the dangers involved in abortion and to offer alternatives to abortion and help in pursuing those alternatives." (*Id.* at ¶ 20.) Plaintiffs allege that their communication is most effective when coming into close contact with women, which allows Plaintiffs to hand out literature and avoid shouting. (*Id.* at ¶¶ 21–25.)

Plaintiffs allege that officers from the Chicago Police Department ("CPD") have enforced the Ordinance against Plaintiffs when it does not apply, preventing the exercise of their First Amendment rights. (*Id.* at ¶ 31.) Plaintiffs detail the following incidents in their complaint:

- On November 19, 2009, near the Family Planning Associates abortion clinic known as the Albany Medical Center ("Albany")—which according to Plaintiffs is now closed—CPD Officer Erbacci told Ana Scheidler that the Ordinance "imposed an *absolute* buffer zone prohibiting any pro-life counselor from coming within 50 feet of a clinic entrance door." (*Id.* at ¶¶ 5, 31 (emphasis in original).) He threatened to cite anyone who came within fifty feet of the clinic door. (*Id.* at ¶ 32.) Additionally, he said that sidewalk counselors could not approach within eight feet of a person walking to the clinic even *more* than fifty feet away from the door. (*Id.* at ¶ 31.) Erbacci's understanding of the Ordinance was incorrect, as the Ordinance prevents individuals from approaching within eight feet of another person within fifty feet of a clinic door. Outside of the fifty-foot zone, the Ordinance does not apply, and, within the fifty-foot zone, the Ordinance does not apply to conduct that does not involve "approaching" within eight feet of another person.

- On November 21, 2009, at Planned Parenthood's Near North Center location (the "Near North clinic"), CPD Sergeant Tietz told Pro-Life Action League counselors that the Ordinance prohibited "approaching *or even standing* within eight feet of anyone approaching the facility entrance door." (*Id.* at ¶ 33 (emphasis in original).) When the pro-life advocates "respectfully challenged the officer's interpretation, he told them that if he had to go get the Ordinance from the station he would come back and arrest them." (*Id.* at ¶ 34.) He then told a pro-life group to remove their signs from within fifty feet of the clinic door. (*Id.*)

- On January 9, 2010, CPD Officer Hagan told pro-life counselors at the Near North clinic that they could not come within 150 feet of the clinic. (*Id.* at ¶ 36.) She then changed her instruction to the following: "You guys cannot come within eight feet of this doorway. If you come within 50 feet of the doorway, and within eight feet of the doorway, and start giving them things, chanting prayers, when someone is coming down, you will be written an NOV. *You cannot do any abortion* [inaudible], counseling, or anything like that. . . . It's a law in the City of Chicago. They made it and I'm here to enforce it." (*Id.* (emphasis in original).) Plaintiffs also allege that they and other pro-life counselors were prohibited by the police officer from speaking to people going to the clinic, even if the counselors were stationary. (*Id.* at ¶ 37.)

- On January 10, 2010, a CPD officer told a pro-life advocate named David Avignone that he could not stand within eight feet of a clinic entrance. (*Id.* at ¶ 38.) He refused, and the officer called for backup. (*Id.*) Eventually, the sergeants who arrived as backup concluded that Avignone was correct. (*Id.* at ¶ 39.)

- On February 13, 2010, at the Near North clinic, Officer Hagan told pro-life counselors that they could not approach within ten feet of the clinic entrance door. (*Id.* at ¶ 40.) The distance of ten feet is not mentioned in the Ordinance.

- On July 3, 2010, pro-life advocate Joseph Holland was praying in a stationary position on a wall a "few feet away from the entrance door to the clinic." (*Id.* at ¶ 42.) He was eventually arrested for "standing within 8 feet of the clinic entrance door." (*Id.* at ¶ 47.) The arresting officer later indicated that he interpreted the Ordinance to prohibit any kind of verbal expression within a 50-foot buffer zone. (*Id.* at ¶ 49.)

- On several occasions, CPD officers have ordered Plaintiffs and other pro-life advocates to stay outside of a 50-foot buffer zone around clinic entrances. (*Id.* at ¶ 53.) The Plaintiffs give examples from October 6, 2012 at Albany involving Sergeant Whitney; February 26, 2013 at Albany involving Officer Haran; March 9, 2013 involving Officer Whitney; June 6, 2015 at Albany; and August 27, 2015 at Albany.[2] (*Id.* at ¶¶ 53–57.)

- On October 11, 2014, at Albany, Sergeant Olszewski of the CPD ordered pro-life advocates to remain at least 50 feet away from the parking lot. (*Id.* at ¶ 79.)

- On November 21, 2015, a CPD officer told a pro-life counselor at a Family Planning Associates clinic (the "Washington clinic") that he could not come within ten feet of the clinic entrance. (*Id.* at ¶¶ 5, 58.)

- On April 2, 2016, at the Near North clinic, Sergeant Murphy of the CPD told pro-life counselors to move 100 feet from the door. (*Id.* at ¶ 60.) After conferring with another officer, he said they "need only move 50 feet away from any entrance to the clinic, and for anyone entering the clinic, the pro-life advocates had to 'give them an eight-foot

---

[2] On this occasion, the officers initially told Plaintiffs that they must stay fifty feet away from the gate of the clinic parking lot, but later reduced it to eight feet. (R. 1 at ¶ 57.)

buffer zone.'" (*Id.*) During this interaction, Sergeant Murphy also said that counselors could not engage with women verbally and mentioned that his understanding of the Ordinance had been informed by what his "higher ups" explained to him. (*Id.* at ¶ 65.)

Plaintiffs also allege that the Ordinance is selectively applied to pro-life advocates but not pro-choice advocates, who, according to Plaintiffs, violate the Ordinance. (*Id.* at ¶ 67.) They detail the following examples in support of their claim[3]:

- On September 27, 2014, Officer Grantz responded to a call from clinic escorts at the Washington clinic. (*Id.* at ¶ 70.) Plaintiffs and other pro-life advocates were ordered to stay at least fifty feet away from the clinic entrance while pro-choice clinic escorts[4] "were allowed free rein within the buffer zone." (*Id.*)

- On October 4, 2014, Officer Grantz ordered Plaintiffs to remain 10–15 feet away from the Washington clinic entrance, but he did not order the pro-choice escorts to do the same. (*Id.* at ¶¶ 72–73.) Officer Grantz told Plaintiffs that the Ordinance did not apply to the escorts because "are invited by the clinic and have 'authorized entry into the building.'" (*Id.* at ¶ 74.) During the same day at the same clinic, CPD Officer Schipplick told pro-life advocates that they must remain at least eight feet from the clinic door, but the officer also told the pro-life advocates that the pro-choice escorts did *not* have to be at least eight feet away. (*Id.* at ¶¶ 77–78.)

- On October 29, 2014, plaintiff David Bergquist stood near the Washington clinic door with a sign expressing his pro-life views. (*Id.* at ¶ 85.) An employee of Pro-Life Action League eventually took his place, and Bergquist moved about four feet from the entrance. (*Id.* at ¶ 86.) CPD officers arrived and told the pro-life counselors that they should move back because they were obstructing the entrance, which Plaintiffs say was not true. (*Id.* at ¶ 87.) Later, after a clinic escort complained, one of the officers "immediately took" the escort's side, telling the Pro-Life Action League employee to move eight feet away from the door. (*Id.* at ¶ 88.)

- On April 4, 2015, responding to complaints by pro-choice escorts, the police told pro-life counselors to move seven or eight feet away from the door based on the Ordinance. (*Id.* at ¶¶ 91–94.) "While Plaintiffs and their colleagues were prohibited even from stationing themselves within eight feet of the clinic entrance, . . . the escorts moved freely within the prohibited zone." (*Id.* at ¶ 95.)

---

[3] All of the examples of selective enforcement also constitute examples of misapplication of the Ordinance, since the Ordinance applies equally to pro-life and pro-choice advocates.

[4] Based on the complaint, clinic escorts are akin to a pro-choice version of a pro-life counselor. They appear to act as counterprotestors against pro-life protestors, and they attempt to shield clinic patients from pro-life counselors.

- On May 21, 2015, Plaintiff Ann Scheidler engaged a woman parking her car at the Albany clinic on the street. (*Id.* at ¶ 96.) A pro-choice escort told her to go to the parking lot and shoved her. (*Id.*) Officer Scalera of the CPD "took the side of the escort, telling Ms. Scheidler that she had no right 'to bother people.'" (*Id.* at ¶ 97.) He did not "instruct the escorts or caution them in any manner." (*Id.* at ¶ 98.)

- On June 6, 2015, at the Washington clinic, a clinic escort admitted to the police that she had "bumped" a pro-life advocate who claimed that the escort had shoved her. (*Id.* at ¶ 99.) The responding officer, Officer Little, "declined to even document the incident." (*Id.*)

- On April 2, 2016, with a police officer present, a pro-life counselor was near the door of a clinic and "reached out to hand [a woman going into the clinic] a gift bag," but a clinic escort blocked the counselor. (*Id.* at ¶¶ 101–02.) "The woman [entering the clinic] stopped, hesitated, as if she were going to come back for the bag, but the escort took her by the arm and pulled her into the clinic." (*Id.*)

Plaintiffs also allege that the nonenforcement of the Ordinance and other laws against the clinic escorts has caused them to grow "more aggressive." (*Id.* at ¶ 90.) They enumerate various instances in which escorts have acted aggressively and have blocked Plaintiffs' movements and messages. (*See, e.g.*, *id.* at ¶¶ 42–45, 81–105.) Some of these instances involve escorts approaching pro-life advocates to order them to move (*See, e.g.*, *id.* ¶¶ 43, 96, 101.) Additionally, Plaintiffs allege that escorts regularly violate the Ordinance, but "the police have never applied the Ordinance against such escorts and pro-choice advocates." (*Id.* at ¶ 69.)

## II.    Procedural History

Plaintiffs filed their complaint on August 23, 2016. (R. 1.) They allege four causes of action. First, Plaintiffs claim the Ordinance violates the First Amendment on its face and as applied. (*Id.* at ¶¶ 109–32.) Second, Plaintiffs allege that the Ordinance violates their due process rights under the Fourteenth Amendment on its face and as applied because it is unconstitutionally vague. (*Id.* at ¶¶ 133–39.) Third, Plaintiffs claim a violation of the Equal Protection Clause based on selective enforcement of the Ordinance. (*Id.* at ¶¶ 140–48.) Fourth,

Plaintiffs allege a violation of the Illinois Constitution.  (*Id.* at ¶¶ 149–53.)  Plaintiffs seek declaratory relief, injunctive relief, nominal damages, and attorneys' fees and costs.  (R. 1 at 32.)

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted."  *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014).  Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*  Put differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  In determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in [a plaintiff's] favor."  *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

## ANALYSIS

### I. First Amendment Facial Challenge

Defendants argue that dismissal is required because, under Supreme Court precedent involving a materially identical law, the Ordinance is a content neutral restriction on speech that passes constitutional muster under intermediate scrutiny review.  (*See* R. 18, Defs.' Mem. Supp. Mot. Dismiss, at 3.)

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const. amend. I). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional" and are subject to strict scrutiny. *Id.* at 2226–27. Content-neutral laws that restrict speech in a public forum like a sidewalk, on the other hand, "are subject to an intermediate level of scrutiny . . . because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 603 (7th Cir. 2012) (alternation in original) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994)); *see McCullen v. Coakley*, 134 S. Ct. 2518, 2529, 2534 (2014) ("[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." (quotation mark omitted) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))).

The parties here dispute whether the Ordinance is content neutral or not, and thus whether strict or intermediate scrutiny applies. (*Compare* R. 18 at 3–6, *with* R. 21, Pl.'s Response Mot. Dismiss, at 4–8.) Defendants contend that under *Hill v. Colorado*, 530 U.S. 703 (2000), the statute is content-neutral. Plaintiffs, in contrast, argue that *Hill* is no longer good law in light of *McCullen v. Coakley*, 134 S. Ct. 2518 (2014), and *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015). The Court now turns to those cases.

In *Hill*, the Supreme Court held that a Colorado statute—which, as Plaintiffs recognize, was nearly identical to the Ordinance at issue here, (R. 15, Mem. Supp. Mot. Prelim. Inj., at 6 &

8

n.1)—was content neutral and valid under intermediate scrutiny.  530 U.S. at 707 n.1, 725–30.

Indeed, as previously noted, the only material difference between the two laws is the size of the

area within which the eight-foot "bubble zone" applies: the Ordinance's restrictions apply inside

of a 50-foot radius, while the Colorado statute's restrictions applied within a 100-foot radius.

*Compare* MCC § 8-4-010(j)(1), *with Hill*, 530 U.S. at 707 n.1 (quoting Colo. Rev. Stat. § 18-9-

122(3)).

The Supreme Court first concluded that the statute was content neutral, *Hill*, 530 U.S. at

725, explaining that (1) "it [was] a regulation of the places where some speech may occur" rather

than a "regulation of speech"; (2) "it was not adopted 'because of disagreement with the message

it conveys'" and the law's "restrictions apply equally to all demonstrators, regardless of

viewpoint, and the statutory language makes no reference to the content of the speech"; and

(3) "the State's interests in protecting access and privacy, and providing the police with clear

guidelines, are unrelated to the content of the demonstrators' speech," *id.* at 719–20 (quoting

*Ward*, 491 U.S. at 791).  Additionally, the Court noted that the statute "places no restrictions

on—and clearly does not prohibit—either a particular viewpoint or any subject matter that may

be discussed by a speaker."  *Id.* at 723.

In reaching its conclusion, the Court rejected the argument that the statute was content-

based "[b]ecause the content of the oral statements made by an approaching speaker must

sometimes be examined to determine whether the knowing approach is covered by the statute"—

that is, to determine whether the speaker approached another person for the purposes of, among

other things, "engaging in oral protest, education, or counseling."  *Id.* at 707 n.1, 720.  The Court

explained that it is acceptable "to look at the content of an oral or written statement in order to

determine whether a rule of law applies to a course of conduct"—for example, to determine if a

communication is a threat or an offer to sell goods. *Id.* at 721. With regard to the conduct that the Colorado statute addressed, the Court noted that "it is unlikely that there would often be any need to know exactly what words were spoken in order to determine whether 'sidewalk counselors' are engaging in 'oral protest, education, or counseling' rather than pure social or random conversation." *Id.* Moreover, the Court explained that in the theoretical case in which reviewing the content of a statement were necessary to determine if it is covered by the statute, such a review would be a "cursory examination" to determine if the communication were "casual conversation." *Id.* at 721–22.

### A. *McCullen* Did Not Overrule *Hill*

Plaintiffs contend that "[t]he very foundations of the Court's reasoning in *Hill* have been eviscerated by *McCullen* . . . and *Reed*." (R. 21 at 5.) In *McCullen*, the Supreme Court considered a Massachusetts statute that, broadly speaking, prevented individuals from knowingly standing on a public way or sidewalk within 35 feet of an entrance to a reproductive health care facility during business hours. 134 S. Ct. at 2526. Various exemptions existed for people entering or leaving the facility, employees or agents of the facility, law enforcement and other municipal agents, and people using the public sidewalk or right of way for the purpose of reaching a location other than the reproductive health care facility. *Id.* The statute in *McCullen* differed from the law at issue in *Hill* as well as the Ordinance, which do not ban people from standing near clinics, but rather prevent people from approaching within eight feet of another person within a certain radius of a healthcare facility without consent for particular purposes. *See supra*. Although the Court found the Massachusetts law content and viewpoint neutral, *McCullen*, 134 S. Ct. at 2534, it held that the law failed under intermediate scrutiny, *id.* at 2534–41.

10

Plaintiffs, drawing on a concurring opinion from *McCullen*, contend that "the majority [opinion] had '*sub silentio* (and perhaps inadvertently) overruled *Hill*' with its observation that a law 'would not be content neutral if it were concerned with undesirable effects that arise from the direct impact of speech on its audience or [l]isteners' reactions to speech.'" (R. 21 at 5 (quoting *McCullen*, 134 S. Ct. at 2546 (Scalia, J., concurring); *McCullen*, 134 S. Ct. at 2531–32 (majority op.) (citation omitted) (internal quotation marks omitted)).) The interest of avoiding the undesirable effects that arise from speech, Plaintiffs argue, "was a core justification for the Colorado statute, and thus *Hill*, undermined by the majority [in *McCullen*], was overruled, even if not expressly, in the view of the three concurring justices." (*Id.* (citing *Hill*, 530 U.S. at 715 (explaining that states have a legitimate interest in the health and safety of their citizens and that this interest "may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests")).)

The question then is whether *Hill* still binds this Court after *McCullen*. The Supreme Court has made clear "that '[i]f a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." (quoting *Hohn v. United States*, 524 U.S. 236, 252–53 (1998))). The Seventh Circuit has said, however, "We are bound to follow a decision of the Supreme Court unless we are powerfully convinced that the [Supreme] Court would overrule it at the first

opportunity." *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987); *see also Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 734 (7th Cir. 1986) ("Ordinarily a lower court has no authority to reject a doctrine developed by a higher one.  If, however, events subsequent to the last decision by the higher court approving the doctrine—especially later decisions by that court, or statutory changes—make it almost certain that the higher court would repudiate the doctrine if given a chance to do so, the lower court is not required to adhere to the doctrine."); *F.D.I.C. v. Mahajan*, No. 11 C 7590, 2013 WL 3771419, at *2 (N.D. Ill. July 16, 2013).

The Court cannot conclude that *Hill* is no longer good law after *McCullen*.  First, *Hill* is directly on point—the Ordinance is the same as the statute at issue in *Hill* except for the size of the radius in which the 8-foot bubble zones apply (the Ordinance provides for a smaller radius and thus restricts less speech than the Colorado statute).  *McCullen*, in contrast dealt with a similar but ultimately distinct statute, as explained above.  Second, the Supreme Court in *McCullen* granted certiorari on two questions: (1) "Whether the First Circuit erred in upholding Massachusetts' selective exclusion law under the First and Fourteenth Amendments, on its face and as applied to petitioners?"; and (2) If *Hill* . . . permits enforcement of this law, whether *Hill* should be limited or overruled?"  Petition for a Writ of Certiorari, *McCullen*, 134 S. Ct. 2518 (2014), (No. 12-1168), 2013 WL 1247969, at *i; *McCullen*, 133 S. Ct. 2857 (2013).  The majority opinion in *McCullen*, however, does not cite to *Hill* except to note that a predecessor to the Massachusetts law "was modeled on a similar Colorado law that this Court had upheld" and that the First Circuit relied on *Hill* to sustain the former version of the Massachusetts statute. 134 S. Ct. at 2525.  Given the precedent indicating that a district court must act with the utmost restraint when determining if a directly applicable Supreme Court case is still controlling, the

Court will not presume the *McCullen* Court overruled *Hill* without mentioning doing so, particularly when the question of whether to overrule *Hill* was squarely before the Court.[5]  Third, it is not clear, as Plaintiffs argue, that the statute from *Hill* was "concerned with undesirable effects that arise from the direct impact of speech on its audience or [l]isteners' reactions to speech."  (R. 21 at 5 (internal quotation marks omitted) (quoting *McCullen*, 134 S. Ct. at 2531–32).)  Instead, the *Hill* Court focused on patients' privacy interests in avoiding unwanted, intrusive communication in situations in which avoiding such communication is not practical.  *See Hill*, 530 U.S. at 715–18.  Furthermore, the statute in *McCullen* was content neutral and similarly oriented to protecting patient access to healthcare.  *See* 134 S. Ct. at 2534–35.

### B.  *Reed* Did Not Overrule *Hill*

Plaintiffs also argue that the Ordinance is not content neutral in light of *Reed*.  That case dealt with a town's "comprehensive code governing the manner in which people may display outdoor signs."  *Reed*, 135 S. Ct. at 2224.  The "sign code" prohibited the display of outdoor signs without a permit, but exempted 23 categories of signs.  *Id.*  The Supreme Court identified three categories as particularly relevant.  *Id.*  The first was "Ideological Sign[s]," which "include[d] any 'sign communicating a message or ideas for noncommercial purposes that is not a Construction Sign, Directional Sign, Temporary Directional Sign Relating to a Qualifying Event, Political Sign, Garage Sale Sign, or a sign owned or required by a governmental agency.'"  *Id.* (first alteration in original) (quoting Gilbert, Ariz., Land Development Code ("Sign Code"),  Glossary of General Terms at 23)).  These signs could measure up to twenty square feet and be "placed in all 'zoning districts' without time limits."  *Id.* (quoting Sign Code, § 4.402(J)).  The second category of signs was "Political Sign[s]," which included "any

---

[5] Two of the justices in the majority in *Hill* also joined the majority in *McCullen*.  While this is not dispositive, it suggests that *McCullen* did not cast *Hill* aside.

'temporary sign designed to influence the outcome of an election called by a public body." *Id.*
(alteration in original) (quoting Sign Code, Glossary at 23). The Sign Code treated these signs
"less favorably than ideological signs." *Id.* The third category of signs was "Temporary
Directional Signs Relating to a Qualifying Event," which included "any 'Temporary Sign
intended to direct pedestrians, motorists, and other passerby to a qualifying event'"—a term
defined as any "assembly, gathering, activity, or meeting sponsored, arranged, or promoted by a
religious, charitable, community service, educational, or other similar non-profit organization."
*Id.* (internal quotation marks omitted) (quoting Sign Code, Glossary at 25). The Sign Code
treated Temporary Directional Signs less favorably than both Ideological Signs and Political
Signs. *Id.*

The Supreme Court concluded that the Sign Code was "content based on its face." *Id.* at
2227. The Court explained that the Sign Code defined (1) Temporary Directional Signs "on the
basis of whether a sign conveys the message of directing the public to church or some other
'qualifying event,'" (2) Political Signs "on the basis of whether a sign's message is 'designed to
influence the outcome of an election,'" and (3) Ideological Signs "on the basis of whether a sign
'comunicat[es] a message or ideas' that do not fit within the Code's other categories." *Id.*
(quoting Sign Code, Glossary at 23–25). As a result, the Court reasoned, the "restrictions in the
Sign Code that apply to any given sign . . . depend entirely on the communicative content of the
sign." *Id.* The Court added that "[m]ore to the point, "the [petitioner] Church's signs inviting
people to attend its worship services are treated differently from signs conveying other types of
ideas." *Id.*

Plaintiffs point to language in *Reed* in which the Supreme Court noted: "Some facial
distinctions based on a message are obvious, defining regulated speech by particular subject

14

matter, and others are more subtle, *defining regulated speech by its function or purpose*.  Both

are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to

strict scrutiny."  (R. 21 at 6 (emphasis in original) (quoting *Reed*, 135 S. Ct. at 2227).)  The

Ordinance, Plaintiffs argue, "on its face regulates speech by its function or purpose."  *Id.*

Furthermore, Plaintiffs contend:

> The Court in *Reed* rejected arguments of the government that the
> regulation could be considered content neutral, even if it expressly
> drew distinctions based on communicative content, as long as the
> Town did not regulate based on disagreement with the message
> contained, [*Reed*], 135 S. Ct. at 2227, or if its interests in
> regulating were unrelated to the content of the regulated speech.
> *Id.* at 2228.  Similar reasons were approved in *Hill*, *see* 530 U.S. at
> 719–20, but the Court in *Reed* decided that these justification put
> the cart before the horse: they skipped "the crucial first step in the
> content-neutrality analysis: determining whether the law is content
> neutral on its face."  135 S. Ct. at 2228.

(R. 21 at 6–7.)

Even if *Reed* seemingly conflicts with some of *Hill*'s reasoning, the Court cannot hold

that *Hill* is no longer binding.[6]  First and most importantly, the Supreme Court in *Reed* did not

discuss whether it correctly decided *Hill* or whether it overruled *Hill*.  Second, while Plaintiffs

correctly note that the *Hill* Court relied on the conclusions that (1) the Colorado law was not

enacted because of disagreement with a particular message and (2) the state's interests embodied

in the law were unrelated to the content of speech, *Hill*, 530 U.S. at 719–20, this reliance was not

the only basis for *Hill*'s outcome.  The Supreme Court also pointed out, for example, that the

Colorado statute regulated the places where speech may occur rather than speech itself.  *Id.* at

719.

---

[6] As Defendants point out, one court has "note[d] that the holding in *Reed* did not overturn the holding[] in *Hill*."
*Reilly v. City of Harrisburg*, No. 1:16-CV-0510, 2016 WL 4539207, at *3 n.4 (M.D. Pa. Aug. 31, 2016); (R. 18 at 4
n.1.).

Additionally, while the *Reed* Court said that laws that define speech based on "its function or purpose" are not content neutral, 135 S. Ct. at 2227; *see also id.* at 2230, it is not clear—especially in light of the Supreme Court's directive to follow an on-point case even if subsequent cases appear to reject the on-point case's reasoning—that the statute at issue in *Hill* is such a law. In *Reed*, the Sign Code "depend[ed] entirely on the communicative content of the sign." *Id.* at 2227. As the Court explained, a sign informing people of a book club meeting in which participants would discuss the works of John Locke would "be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs w[ould] be treated differently from a sign expressing an ideological view rooted in Locke's theory of government." *Id.* In *Hill*, in contrast, it was not the message of the speech that was important—instead it was the manner of speech. 530 U.S. at 721–22. The Colorado law singled out messages conveyed through "leafletting, displaying a sign, or engaging in oral protest, education, or counseling," but, unlike the Sign Code, the Colorado law had nothing to say about what one can talk, counsel, educate, protest, or leaflet about. *Id.* at 707 n.1; *see also Turner*, 512 U.S. at 645 (explaining that rules that make distinctions "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry" are not presumed to violate the First Amendment).[7]

---

[7] Plaintiffs also rely on *Norton v. City of Springfield*, 806 F.3d 411 (7th Cir. 2015), a case in which the Seventh Circuit applied *Reed* to an ordinance that prohibited oral requests for an immediate donation of money and concluded that the ordinance was not content neutral. *Norton* does not help Plaintiffs here, however, because it is not a decision of the Supreme Court and *Hill* was not directly on point in that case. Additionally, the Ordinance, unlike the law at issue in *Norton*, is not clearly a "subject-matter regulation." *Norton*, 806 F.3d at 412. In *Norton*, the law mandated that in certain situations people could not speak about a particular subject—asking for an immediate donation of money. *Id.* The Ordinance, in contrast, permits individuals to speak about any subject, but limits the manner in which they convey information (*i.e.*, by prohibiting counseling). In other words, the Ordinance is not clearly a "law distinguishing one kind of speech from another by reference to its meaning," *id.*—for example, "a law that distinguishes discussion of baseball from discussion of politics," *Left Field Media LLC v. City of Chicago*, 822 F.3d 988, 992 (7th Cir. 2016). Given that the laws in *Norton* and this case are not exactly alike and given that the Court is bound to follow *Hill*, which is directly on point, the Court must apply the holding of *Hill*.

### C.     *Hill* Controls the Intermediate Scrutiny Analysis

Because the Ordinance is content neutral, the Court must determine if the Ordinance is narrowly tailored to serve a legitimate and significant governmental interest and that "it leaves open ample alternative channels for communication." *Hill*, 530 U.S. at 725–26. *Hill* upheld a statute under the intermediate scrutiny test that was materially identical to the law at issue here except that the Ordinance has a smaller radius in which the eight-foot bubble zone applies (and therefore is less restrictive than the Colorado statute). *Id.* at 725–30. The City of Chicago passed the Ordinance in light of *Hill* and the government relies upon it here. Because *Hill* controls this case, Plaintiffs' facial claim cannot succeed. *See Hoye v. City of Oakland*, 653 F.3d 835, 844–45 (9th Cir. 2011) (explaining that an ordinance was modeled after the law in *Hill*, so the "analysis of the Ordinance's facial constitutionality [wa]s mostly controlled by that case" except where the ordinance departed from the Colorado statute).

Plaintiffs argue that dismissal is not appropriate because Defendants carry the burden to show evidence supporting their proffered justification for the Ordinance and Defendants have not submitted factual support at this stage in the litigation. (R. 21 at 6 n.3.) Here, however, *Hill* is directly on point and provided the model for the Ordinance. "Where the courts have already upheld a similar ordinance because of the governmental interests at stake, a future litigant should not be able to challenge similar governmental interests without showing some distinction at the pleading stage." *Graff v. City of Chicago*, 9 F.3d 1309, 1323 (7th Cir. 1993) (en banc) (plurality op.) (discussing other Seventh Circuit cases in which the court affirmed the dismissal of facial

---

Plaintiffs further argue in a sentence-long footnote that the Ordinance is content-based because it "exempts speech related to labor disputes at health care facilities" but restricts abortion speech. (R. 21 at 6 n.4.) Plaintiffs base this argument on an Illinois state law that preempts local law. (*Id.*) Cursory arguments raised in footnotes are deemed waived. *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013); *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009); *Keith v. Ferring Pharma., Inc.*, No. 15 FC 10381, 2016 WL 5391224, at *13 (N.D. Ill. Sept. 27, 2016). Additionally, the Ordinance—the law the Plaintiffs challenge as content-based—makes no distinction based on speech related to labor disputes. Instead, state law makes such a distinction.

challenges).[8]  Plaintiffs do not point to sufficient facts alleged in the complaint that justify

departure from the Supreme Court's holding in *Hill* regarding the facial validity of a law

identical to the Ordinance in all material respects (other than the Colorado law's broader radius

in which it applies).  Accordingly, Plaintiffs' facial First Amendment claim cannot succeed.[9]

## II.  As-Applied Challenges

Plaintiffs argue that even if *Hill* controls, "it certainly has no bearing on Plaintiffs' *as-

applied challenge*."  (R. 21 at 9.)  Plaintiffs point to two problems with the enforcement of the

Ordinance: that it is selectively enforced against only pro-life advocates and that it is regularly

misinterpreted by police officers, resulting in its enforcement in situations in which it does not

apply.  (R. 21 at 13.)  Defendants argue that the Court should dismiss the claim because Plaintiffs

fail to plead a claim in accordance with *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658

(1978).  (R. 18 at 10.)  Specifically, Defendants argue that under § 1983, the City[10] is not

vicariously liable for the acts of its employees.  Instead it is liable for the acts of City employees

committed pursuant to a City policy.  (R. 18 at 10–11.)  According to Defendants, Plaintiffs have

failed to adequately plead that it is City policy to enforce the Ordinance only against pro-life

---

[8] Both concurring opinions in this case agreed with the plurality opinion's conclusion that dismissal of the plaintiff's First Amendment claim was appropriate under the intermediate scrutiny test for reasonable time, place, and manner restrictions.  *See Graff*, 9 F.3d at 1319–23 (plurality op.); *id.* at 1333 (Flaum, J., concurring); *id.* at 1335 (Ripple, J., concurring) ("I therefore respectfully submit that time, place, and manner analysis is an appropriate analytical tool for the assessment of this statute, and, like my colleagues who have joined the principal opinion, I believe that the ordinance in question can be sustained on this basis.").  The en banc panel in *Graff* consisted of twelve judges.  Five judges joined the plurality, three judges dissented, Judge Cudahy joined Judge Flaum's concurrence, and two judges joined Judge Ripple's concurrence (including Judge Cudahy).  Consequently, a majority of the en banc panel agreed that dismissal of the plaintiff's First Amendment claim was appropriate.

[9] Plaintiffs' arguments that the Ordinance is unconstitutionally vague and overbroad, (*see* R. 27, Defs.' Reply, at 5–7 (discussing Plaintiffs' contentions)), also must fail under *Hill*, which considered and rejected those arguments, 530 U.S. at 730–33.  This Court is bound by *Hill*'s resolution of those issues.  Additionally, Plaintiffs' claim that the ordinance is an unconstitutional prior restraint is dismissed under *Hill*, 530 U.S. at 734, and because Plaintiffs failed to respond to Defendants' argument that this claim should be dismissed under *Hill*, (*see* R. 27 at 9–10).

[10] Plaintiffs' claims against the Mayor, Superintendent of the Chicago Police Department, and the Commissioner of the Department of Transportation are official capacity claims, which the Court construes as suits against the municipality.  *See Kentucky v. Graham*, 473 U.S. 159, 167–68 & n.14 (1985); *Yeskigian v. Nappi*, 900 F.2d 101, 103 (7th Cir. 1990); *Suber v. City of Chicago*, 10 C 2876, 2011 WL 1706156, at *2 n.2 (N.D. Ill. May 5, 2011).

advocates or to enforce it improperly in situations in which it does not apply. (*Id.* at 10–13.) Consequently, Defendants contend, the Court should dismiss this claim. (*Id.* at 13.)

A municipality may face liability under § 1983 for unconstitutional acts caused by "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). With respect to the second category, *Monell* liability attaches if a widespread custom or practice violates the constitution, *Gable v. City of Chicago*, 296 F.3d 531, 537 & n.3 (7th Cir. 2002), or if municipal "policymakers were 'deliberatively indifferent as to [the] known or obvious consequences [of a practice]'"—"[i]n other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect [Plaintiffs]." *Id.* (first alteration in original) (quoting *Gable*, 296 F.3d at 537). The training of law enforcement personnel can be "so inadequate that it amounts to a 'policy' of 'deliberate indifference to the rights of persons with whom the police come into contact.'" *Smith v. City of Joliet*, 965 F.2d 235, 237 (7th Cir. 1992) (quoting *Graham v. Sauk Prairie Police Comm'n*, 915 F.2d 1085, 1100 (7th Cir. 1990)); *see also Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006). This deliberate indifference standard is not met by mere negligence or even gross negligence or recklessness. *Smith*, 915 F.2d at 1100.

The Seventh Circuit has made clear that "there is no clear consensus as to how frequently" certain conduct must occur to impose *Monell* liability based on a widespread custom or practice, although the Seventh Circuit has in certain contexts held that one instance and three instances were insufficient. *See Thomas*, 604 F.3d at 303 (citing *Cosby v. Ward*, 843 F.2d 967,

983 (7th Cir. 1988), and *Gable*, 296 F.3d at 538).[11]  "[A] series of violations," however, can "lay

the premise of deliberate indifference."  *Id.* (quoting *Palmer v. Marion County*, 327 F.3d 588,

596 (7th Cir. 2003)); *see also Sroga v. Preckwinkle*, No. 14 C 06594, 2016 WL 1043427, at *7

(N.D. Ill. Mar. 16, 2016) ("Generally speaking, to adequately state a widespread-practice claim

under *Monell*, [the plaintiff] must allege repeated constitutional violations to raise the inference

that the [defendant municipality] was 'aware of the risk created by the custom or practice . . . and

failed to take appropriate steps,' *Thomas*, 604 F.3d at 303, or that the risk was 'so obvious' that

the policymakers can be said to have been deliberately indifferent to the risk, *City of Canton,

Ohio v. Harris*, 489 U.S. 378, 389 (1989).'"); *Hare v. County of Kane*, No. 14 C 1851, 2014 WL

7213198, at *2 (N.D. Ill. Dec. 15, 2014).  "[I]t is not impossible for a plaintiff to demonstrate the

existence of an official policy or custom by presenting evidence limited to his experience," but

the presentation of such evidence makes it more difficult to show there was a widespread custom

or practice instead of a random event.  *Grieverson v. Anderson*, 538 F.3d 763, 774 (7th Cir.

2008); *see also Jaythan v. Bd. of Educ. of Sykuta Elementary Sch.*, No. 16 C 5700, 2016 WL

6596054, at *4 (N.D. Ill. Nov. 8, 2016) (published op.).  When the same incident of which a

plaintiff complains "has arisen many times and the municipality has acquiesced in the outcome,

it is possible (though not necessary) to infer there is a policy at work."  *Valentino v. Vill. of S.

Chi. Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (quoting *Lewis v. City of Chicago*, 496 F.3d 645,

656 (7th Cir. 2007)).

      Plaintiffs have alleged sufficient instances of improper enforcement of the Ordinance to

state a plausible claim under *Monell*.  As recounted in the Background section, Plaintiffs have

---

[11] The Court notes that in *Gable*, where the Seventh Circuit concluded that three instances were insufficient, the litigation had proceeded to the summary judgment stage.  296 F.3d at 541.  It "thus do[es] not speak to the nature of allegations sufficient to survive a motion to dismiss."  *Caines v. Vill. of Forest Park*, No. 02 C 7472, 2003 WL 21518558, at *5 (N.D. Ill. July 2, 2003).

alleged numerous—at least fifteen—examples of improper enforcement of the Ordinance at a variety of locations involving various pro-life advocates and police officers. These instances include, for example, treating the Ordinance as a 50-foot buffer zone, referring to distances not mentioned in the Ordinance, enforcing the Ordinance based on the distance from a parking lot gate rather than the entrance door to a clinic, or prohibiting pro-life advocates from standing in a particular place without reference to whether they were "approaching" another person as the Ordinance requires. Plaintiffs also allege at least seven occasions in which (1) the police told pro-life advocates that they could not stand in a particular location without telling the same thing to pro-choice advocates or (2) the police appeared to reflexively favor pro-choice advocates over pro-life advocates. Additionally, the Plaintiffs allege that pro-choice advocates regularly violate the Ordinance without any police intervention. Taking these allegations as true and adding in the many times the police have intervened against Plaintiffs, the Court can reasonably draw an inference that permits Plaintiffs' selective enforcement theory to survive the current motion to dismiss.

In short, taking all of Plaintiffs' allegations as true and making reasonable inferences in their favor, the complaint sufficiently alleges a pattern of conduct that indicates a widespread custom or practice of discriminatory enforcement of the Ordinance, deliberate indifference to the widespread unconstitutional enforcement of the Ordinance, or a training policy that is "so inadequate that it amounts to a 'policy' of 'deliberate indifference to the rights of persons with whom the police come into contact.'"[12] *Smith*, 965 F.2d at 237 (quoting *Graham*, 915 F.2d at 1100); *cf. Serna v. Sears*, No. 13-cv-03359, 2015 WL 3464460, at *2–3 (N.D. Ill. May 29, 2015)

---

[12] Defendants have not argued that the discriminatory enforcement of the Ordinance and the improper enforcement of the Ordinance do not violate the Constitution. Instead, they focus on the question of whether Plaintiffs can tie the allegedly unconstitutional enforcement of the Ordinance to the City of Chicago under *Monell*.

(concluding that a *Monell* claim survived a motion to dismiss because a plaintiff need not prove his claim at the pleading stage); *Hare*, 2014 WL 7213198, at *2–4 (concluding that a single plaintiff's allegations of frequent instances of inadequate medical care in a jail over a twenty-five day period were sufficient to "provide an implication that" a widespread policy existed of providing all inmates with that particular plaintiff's medical needs with inadequate care); *McGee v. City of Chicago*, No. 11 C 2512, 2011 WL 4382484, at *4 (N.D. Ill. Sept. 16, 2011) (explaining that a *Monell* claim survived a motion to dismiss even though the plaintiff "provide[d] little in the way of facts regarding the specific contours of the policy, whether the policy was express or more akin to a custom, or how widespread it was"). Moreover given the sufficiency of these allegations, discovery could uncover additional evidence currently unavailable to Plaintiffs of a widespread practice—for example, deposition testimony of CPD officers regarding CPD policies—which would further bolster Plaintiffs' claims. *See Olson v. Champaign County*, 784 F.3d 1093, 1100 (7th Cir. 2015) (explaining that plaintiffs' "pleading burden should be commensurate with the amount of information available to them" and, in such a situation, allegations are sufficiently plausible if they raise a reasonable expectation that discovery will reveal supporting evidence (quoting *Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010))).

Accordingly, Plaintiffs' Equal Protection claim and as-applied First Amendment claim arising from an alleged widespread policy of discriminatory enforcement, inadequate training, or deliberate indifference to constitutional violations survive Defendants' motion to dismiss.[13]

---

[13] Defendants argue that the Court should dismiss Plaintiffs' claims under the Illinois Constitution for the same reasons that the Court should dismiss Plaintiffs' claims under the First Amendment. (R. 18 at 13.) Alternatively, Defendants request that the Court decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims. (*Id.*) Plaintiffs make no argument related to their Illinois constitutional claims. Assuming Defendants are correct that the Illinois Constitution is coextensive with the First Amendment—which is a questionable proposition, *see Peterson v. Vill. of Downers Grove*, 103 F. Supp. 3d 918, 925 n.3 (N.D. Ill. 2015) (citing *City of Chicago v. Pooh*

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss.

**DATED: January 4, 2017**                          **ENTERED**

_____

AMY J. ST. EVE
U.S. District Court Judge

---

_Bah Enters., Inc._, 865 N.E.2d 133, 168 (Ill. 2006))—the Court dismisses the Plaintiffs' Illinois constitutional claims only to the extent that they mirror the federal claims dismissed in this opinion.